**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:                                              Bankruptcy No. 17-24771 JAD

      DILLE FAMILY TRUST,                    Chapter 11
      (punatively, a California
      Business Trust),

            Debtor


DON MURPHY, LORRAINE DILLE               Related to Doc. No. 453
WILLIAMS, ROBERT NICHOLS
FLINT DILLE, and TEAM ANGRY
FILMWORKS, INC.,

            Movants

      VS

ROBERT S. BERNSTEIN, Chapter
11 Trustee, LOUISE A. GEER,
NOWLAN FAMILY TRUST, and
DILLE FAMILY TRUST, (putatively,
a California Business Trust),

            Respondents


**LOUISE A. GEER'S MEMORANDUM IN OPPOSITION TO
EXPEDITED JOINT MOTION TO DISMISS THE
CHAPTER 11 CASE OF DILLE FAMILY TRUST,
FOR CAUSE, PURSUANT TO 11 U.S.C. §1112(b)**


**INTRODUCTION:**

     Movants, Don Murphy and Team Angry Filmworks, Inc. as well as Robert

Nichols Flint Dille and Lorraine Dille Williams are judicially estopped from asserting the

instant Motion because they entered into a settlement agreement (Dille and Williams are

both on the term sheets for the agreement and are contemplated as parties and they

supported the agreement/Fed. R. Bank. Pro. R. 9019 settlement) as part of a proposed settlement and plan which consented to, acknowledged, and accepted this bankruptcy. They did not question the matters complained of at that time and should not be permitted to complain now.

In re I.D. Craig Service Corp, 118 B.R. 335 (Bankruptcy W.D. PA 1990 JKF) in a Motion to Dismiss the Court held that the moving party had waived it right to challenge the filing through ratification of certain actions and by laches in failing to file a Motion to Dismiss. As in our case the movant knew of the filing, participated in hearings, claims, and motions and formed a plan of reorganization through the Trustee before it decided to question the filing – for a SECOND time (the first having been withdrawn). Movant ratified the appropriateness of the case when it filed its own plan through the Trustee. Judge Fitzgerald also opined that it would be unjustifiable and inequitable to dismiss a bankruptcy after proceedings had gone on for over a year. Don Murphy, who is characterized as an interested party, has no standing, see Oppositions to Fed R. Bank. Pro. R. 9019 Motion (ECF 358-365) in this case and his company, Team Angry Films, which also has no standing in this case, has, together with the two Beneficiaries of the Dille Family Trust filed a Motion to Dismiss the instant Bankruptcy despite the fact that a plan is currently pending which would pay significant portions of the unsecured debt in this matter, eliminate the dispute between The Nowlan Family Trust and the Dille Family Trust over the most important asset of the Trust, (which is not an asset at this time), namely the United States registered trademark for Buck Rogers, and which would flow all of the property into one special purpose vehicle which could then reasonably administer the Buck Rogers property.  As a general proposition, if the Court were to grant

the Motion of these Movants, it would throw the property into chaos as it would be necessary to proceed with the trial currently pending in the Eastern District of Pennsylvania which deals with the primary asset of the Trust, the U.S. Buck Rogers trademark.   Whichever side wins this dispute will for all intents and purposes have control of Buck Rogers irrespective of the position taken by Team Angry Filmworks, Mr. Dille, and Mrs. Williams. Numerous scandalous, impertinent, and flat out incorrect assertions are made in the Memorandum of Team Angry, et al.  These assertions are for the most part misrepresentations, speculation with no factual basis, and most importantly total and complete fabrications and serious factual misstatements.

In order for the Court to understanding the seriousness of the misrepresentations made by Team Angry and the two beneficiaries in this motion and their Declarations, it is absolutely essential to consider the background of this matter through documentation. Accordingly, let us focus on the history of this case, and the responsibility of Mr. Robert Nichols Flint Dille, Lorraine Dille Williams, and Don Murphy and his company Team Angry Filmworks for the present situation of DFT. Since 1929 the primary intellectual property asset of the Dille Family and later the Dille Family Trust was Buck Rogers (it is the sole intellectual property asset of the Trust).  The first Buck Rogers newspaper strip premiered on January 7, 1929.  The business was run by John F. Dille and later by his son Robert Dille.  Later the property was placed in the Dille Family Trust.  The Trustees were Robert, Virginia (his spouse) and attorney Arthur Martin.  The Trust functioned as a business trust and granted numerous licenses. This all changed with the death of Robert and Virginia and with Flint Dille taking control of the Trust (and has done so on an ongoing basis).  Within two years of his taking over the Trust business he had literally

run the Trust into the ground by losing its primary asset, the Buck Rogers United States registered trademark. In February, 2009, Virginia Dille let Robert Flint Nichols Dille, hereinafter referred to as "Flint Dille," take complete control of the Dille Family Trust. He had acted as the manager of the Trust since 2007, with his mother signing off on agreements, but deferring to his judgment.  He was not appointed, nor operating under any written grant of authority; Lorraine Dille Williams, his sister, hereinafter referred to as "Lorraine Williams," was "out" and she assented to this arrangement.  Flint Dille asserted that he owned the property of the Trust.  Dille asserted that he owned Buck Rogers on more than one occasion.  While he acted as Trustee he deposited funds received for licenses into his personal checking account.  He entered into numerous oral contracts and agreements for services with friends and associates and made undocumented payments to them and himself.

Lorraine Williams testified in her deposition taken in the <u>Dille Family Trust v. Nowlan Family Trust</u> case, in the United States District Court for the Eastern District of Pennsylvania, No. 2:15-cv-06231, on January 10, 2017, as follows:  A: "He took the total role," Tr. at page 28, line 20.  Williams also testified her involvement ended with her mother's passing, Id. at 20. She testified that the other co-Trustee, Arthur Martin took a passive role, Tr. at 24.  Lorraine Williams testified that Flint Dille had the authority to act in behalf of the Trust to the point of signing a contract, Id., at 29.

Ms. Williams further explained that Flint Dille continued to play an active role in the Trust which changed after their mother died and that the co-Trustee Arthur Martin, made it clear that he really wanted to retire, Tr. at 31.  Ms. Williams also explained that "so basically it is not a Trust that had a ton of assets that would interest a bank or a

traditional national management company so we looked around to find somebody who could manage this kind of Trust, which is you know, a different animal.

Most importantly, Ms. Williams characterized her brother's manner of handling, or as the case was, mishandling the affairs of the Trust prior to Louise Geer taking the position as the Trustee.  At page 88 of the transcript the question is asked:  "Did you and Flint Dille have any disagreements regarding how the intellectual property of the Dille Family Trust should be maintained after your mother passed away?"  Answer:  "Yeah." Question:  "And what was the nature of those disagreements?"  Answer:  "I'm a business person.  I'm very methodical.  I, you know, I see a process for doing stuff.  Flint is a creative person.  He has absolutely no sense of business.  He doesn't understand, you know, how things are done, and we locked horns over it periodically.  Didn't want to spend the money for the attorney to do the maintenance and all that.  That's money you have to spend.  And you know, I mean, it's a business versus a creative person." Question:  "So to be clear, so you're saying Flint didn't want to spend the money to maintain the trademarks?"  Answer:  "He didn't think it was, it always, his whole life had been maintained by someone else.  It's not that - - he didn't know.  He didn't know about it…."

Under Flint Dille's mismanagement the Trust lost its major asset, its United States Registered Trademark "Buck Rogers" due to his fraudulent misrepresentations in the application, and after being caught, the Trust voluntarily surrendered the mark and the Nowlan Family Trust proceeded with its application for an intent to use United States registered trademark for Buck Rogers which was opposed by DFT and is awaiting resolution in the Eastern District of Pennsylvania where the matter is to be tried before a

jury (this matter has been stayed by the trial Judge as there is no counsel for the Trust at this time).

DFT/Geer filed a Writ of Summons in Lawrence County, Pennsylvania, to toll the Statute of Limitations as to Dille's actions which were detrimental and harmful to the Trust. No action or Rule was issued by Dille and the matter remained active and on the docket during Geer's tenure.

As has been previously mentioned the registered trademark for Buck Rogers in the United States was the most important and central asset of the Dille Family Trust. Mr. Dille, for whatever reasons, terminated the prior representation of the law firm that had been handling all matters pertaining to the Buck Rogers property and hired the law firm of Fross, Zelnick Lehrman, and Zissu in New York City in 2009. Flint Dille was in complete control of the Trust's application for renewal of the United States registered trademark, Buck Rogers. A copy of the Trademark Trial and Appeals Board docket is attached as Exhibit "A" and incorporated by reference herein, which sets forth the filing date and other pertinent information to show that a word mark was requested specifically citing two categories, GNS board games and GNS newspaper strips. It should be noted that there are numerous categories for trademark registrations and for some curious reason Mr. Dille and his counsel only picked these two categories (and did not file an intent to use application seeking to expand the number of categories, which is permissible). Subsequent to the filing of the Application for Renewal of the Trademark by DFT, John J. O'Malley, counsel for the Nowlan Family Trust filed a Petition for Cancellation, filing date October 26, 2009, attached hereto as Exhibit "B" and incorporated by reference herein, this Petition to Cancel is extremely interesting in that it

makes very serious allegations with regards to the propriety and validity of the said Applications.  A review of Count 1, paragraphs five, six, seven, eight, nine, ten, and eleven, is extremely disturbing as it goes to the credibility of Mr. Dille acting as the then sole representative of the Dille Family Trust business.  Count I, entitled fraud, sets forth the following averments:

> 5.  Upon information and belief registrant has not used the mark Buck Rogers in commerce on or in connections with the goods listed in registration number 714-185 since 1999.
>
> 6.  Upon information and belief registrant's sworn declaration submitted as part of its renewal application in 2001 which states that the mark Buck Rogers was still in use in 2001 for newspaper strips was knowingly and intentionally false.
>
> 7.  Upon information and belief registrant maintained registration number 714, 184 by false means and by knowingly and willfully making false and or fraudulent declarations or representations to the United States Patent and Trademark office including, inter alia, falsely alleging that the marks and registration 714, 184 is still in use, when on information and belief registrant had not used the mark or in connection with each of these goods since before 1999.
>
> 8. Upon information and belief registrant knew at the time it had filed its trademark renewal that it had not used the Buck Rogers marks in commerce or in connection with each of the goods listed in registration number 714-184.
>
> 9.  Upon information and belief, said false statements were made with the intent to induce the United States Patent and Trademark Office to renew registration number 714, 184, and reasonably relying upon the truth of said false statements, the United States Patent and Trademark Office did, in fact, renew said registration to registrant.
>
> 10.  Upon information and belief, registrant committed fraud in maintenance of registration number 714, 184.
>
> 11.  Applicant is damaged by registration number 714, 184, and hereby respectfully requests that its Petition to Cancel Registration Number 714, 184 be granted.

As Flint Dille was completely involved with regards to this it brings into question his veracity, as well as his judgment.  Clearly, Mr. Dille had created a situation where serious opposition was being made to the most important asset of the Dille Family Trust, its trademark.

It should be noted that Mr. Dille entered into a retention agreement with Fross, Zelnick, Lehrman, and Zissu, an intellectual property law firm in New York. Unfortunately, Mr. Dille did not pay this law firm on a regular basis which resulted in

them withdrawing their appearance in behalf of the Dille Family Trust.   Suit was

subsequently filed against the Dille Family Trust and was finally resolved by Geer as

Trustee, and Mr. Dille as well as Lorraine Dille Williams insisted that Fross Zelnick had

deviated from the standard of care, breached its contract, and had not operated in a

correct and proper manner in representation of the Dille Family Trust.   This will be

explored in greater detail when we review the lengthy deposition of Lorraine Dille

Williams taken on January 10, 2017 (while to some extent it repeats aspects of what has

already been presented, it is useful to see her testimony in one lengthy excerpt as it

substantially contradicts her Declaration), See Exhibits "C" and "D", Affidavits of Flint

Dille and Lorraine Williams in the matter.   As a result of the withdrawal of Fross,

Zelnick, the Trust was put in an unenviable situation of having to move forward in a

situation where various discovery was pending.

A review of the docket sheet from the United States Patent and Trademark

Office indicates the chronology of events beginning with the filing of the renewal on

October 26, 2009.  The docket is self-explanatory but indicates that an Answer was filed,

which has already been discussed, Fross Zelnick filed a Request to Withdraw as Attorney

on June 2, the Nowlan Family Trust filed a Motion to Compel Discovery on June 4, that

Notice of Default was entered on July 21, the proceedings resumed on August 19, and

subsequently a Request for Consideration was filed and denied by a new lawyer and

subsequently the Nowlan Family Trust renewed its Motion to Compel Discovery,

ultimately resulting in the voluntary surrender of the registration with the Board granting

this decision.  In essence, Flint Dille, who was solely in control of the Dille Family Trust

created the spark which ignited the events regarding the Trust and its primary asset, the

Buck Rogers United States registered trademark from that point to the present.  Due to Mr. Dille's gross incompetence, negligence, failure to properly discharge his responsibilities (which he took upon himself with the ascent of Lorraine Williams, his mother, and attorney Arthur Martin) acting as the sole trustee, the Dille Family Trust went from having a United States registered trademark for Buck Rogers to having nothing.  Mr. Dille was counseled to assert the common law trademark as the Trust had no registered trademark.

Chronologically as the Dille Family Trust had its application terminated (voluntarily surrendered) with the motion filed by Mr. Pilosof, where the mark was voluntarily surrendered, the Nowlan Family Trust, which had a trademark application pending, began to move forward with its attempt to gain an intent to use United States registered trademark for Buck Rogers.

Numerous allegations have been made that Louise Geer and her legal counsel have been involved in endless litigation.  This is completely inaccurate as all the litigation had as its beginning point Mr. Dille's voluntary surrender of the trademark.  Without speculating if Mr. Dille had been honest, forthright, and had allowed the actual Trustee and Co-Trustee to do their jobs and retain the original law firm handling the matter, the Dille Family Trust would currently <u>not</u> be in the dire straights that it is.  For anyone to point a finger at anyone other than Mr. Dille is an admission that they are unaware of the underlying facts in the record in this matter.  Let us move on to consider the litigation which resulted as a result of Mr. Dille's voluntary surrender of the Buck Rogers trademark.  Flint Dille's failure to pay the law firm representing the Trust resulted in its  withdrawing from the trademark litigation and with that firm filing suit against the

Trust for substantial legal fees.  Flint Dille's response was to accuse them of negligence and incompetence.  Lorraine Williams made the same accusations, see Exhibits "C" and "D".  (As it is clear, the Trustee Geer inherited the Fross, Zelnick situation) Litigation which would include Fross, Zelnick's (the law firm) withdrawal, the voluntary surrender of the Buck Rogers trademark, as well as having to deal with the Fross, Zelnick litigation for attorney's fees. It should be noted that upon receipt of Fross, Zelnick's Complaint, the litigation was referred to Kloss, Stenger and LoTempio, a law firm in New York which routinely handles litigation of this nature.   The Beneficiaries, and both of them, Flint Dille and Lorraine Williams, were adamant that the claims of Fross Zelnick were unreasonable in light of the fact that FZLZ withdrew from the litigation.  Moreover, Flint Dille was passionately adamant that they should not be paid.  Attached as Exhibit "E" and incorporated by reference herein is a copy of the Complaint filed in behalf of Fross, Zelnick to collect its fees.  Attached as Exhibit "F" and incorporated by reference herein is the Answer, Defenses and Counterclaim.  Mr. Dille has asserted frequently in various Declarations that litigation should have been settled immediately.  When the litigation was occurring he was not of that opinion.  Indeed Mr. Dille was adamant that the matter be litigated as is demonstrated by the Affidavit that he authored and which he signed under oath which is attached hereto as Exhibit "C".  This Affidavit makes it abundantly clear that he questioned Fross, Zelnick's claim, he questioned their competence, questioned their billing and questioned the entire lawsuit.   Mr. Dille now comes conveniently before the Court in a Declaration and contradicts the position that he took when the litigation occurred.  Ms. Williams also was in support of the litigation as is evidenced by the transcript of her testimony taken in discovery in the Eastern District

case.  She oversaw the litigation and commented on every aspect of it with Ms. Geer and ultimately approved the settlement and indeed loaned the Trust the funds to settle.  It should be noted, as will be discussed later, that from 2011 until Mr. Dille's decision to become partners with Don Murphy in an attempt to put Buck Rogers into the public domain (using this as a tactic to get a license when one had already been negotiated with another company) the Trustee issued numerous status reports in 2011, and annual reports in 2011, 2012, 2013, 2014 and had an annual meeting in 2015.  She also communicated all decisions to the Beneficiaries (or to Dille's legal counsel) and had non-stop interaction with the beneficiaries contrary to the assertions in the Movant's Memorandum.

Ultimately the Beneficiaries were brought in as part of this litigation in the Fross, Zelnick litigation and Geer felt it was her responsibility to tender a defense in behalf of both of the Beneficiaries, which she did.  Ultimately the matter was settled by Geer with the Beneficiary, Ms. Williams' consent and support and Williams paid the settlement from her own monies.  It should be noted that, as the previously referred testimony as well as the Affidavit of Louise Geer indicate, Ms. Williams helped guide the Fross, Zelnick litigation, was directly involved in making suggestions and comments with regards to that litigation, and her suggestions and comments were indeed utilized by Geer.  It should also be noted that Mr. Dille made numerous suggestions with regards to moving forward with the litigation against Fross, Zelnick and his position did not change until his partnership with Mr. Murphy, when he asserted that the cases should have been settled earlier (although he offered no money towards a resolution).   Mr. Murphy and Mr. Dille, through Mr. Murphy's company, sought to take the sole property of the Trust,

the Buck Rogers trademark, and pull it into the public domain which would make the Trust itself valueless.

Movants in its Section III (pages 14 – 20) seek to establish, by reference to Exhibit "G" attached hereto and incorporated by reference herein, (Doc 239), a Memorandum Opinion issued by this court, that Geer has operated in bad faith and appointed the present Trustee. They do not point out that the record was 'undisputed' [Doc 239] at that time and that no testimony had been presented by Geer's Bankruptcy counsel who that day took full responsibility for providing discovery (and who unfortunately passed away shortly thereafter). A hearing on that matter has been requested but not held. Parsing away the hyperbolic and emotional aspects of Movants' arguments, there are very few items remaining that might qualify as factual.

In the short period Flint Dille controlled the Trust he managed to undo the work of decades and lose the primary asset of the Trust, its U.S. Registered Trademark. It was under these circumstances that Louise Geer took over as Trustee. Geer was appointed Successor Trustee by Dille and Williams in June/2011. As has already been pointed out, and contrary to false assertion of the Movants, Geer was in constant communications with Flint Dille (or his attorney Richard Thompson) and Lorraine Williams. She clearly fulfilled her fiduciary obligations and gave them financial reports, licensing reports and sought their opinions and support. Without being repetitive, the Trustee was unable to communicate with Flint Dille after he became partners with Don Murphy in an attempt to undermine the prime asset of the Trust, Buck Rogers. It is clear any information received by Flint Dille would immediately be passed on to an adverse party to the Trust, Don Murphy. Flint Dille, not the Trustee, was violating his fiduciary obligations to the Trust

and the other beneficiary.  Lorraine Williams concurred with this conclusion and funded the litigation against Team Angry Filmworks.

Geer hired a licensing company (at the recommendation of Flint Dille and Lorraine Williams who had been using the firm) Licensing Works (also referred to "LW").  The Trust generated licenses through Licensing Works.  Jane McGregor, part of LW began to work on licensing a film or television deal.  Through the period 2011 through 2015 Geer informed both beneficiaries of the activities of the Trust, LW, and all developments on a weekly and/or monthly basis.  Dille (directly or through his counsel Richard Thompson) and Williams were informed of all financial activities, expenditures, litigation and licensing of the Trust.  Flint Dille and Loraine Williams had unrestricted access to LW, its principals, Jane McGregor and the Trustee. Numerous progress and accounting reports were given (in writing) to the beneficiaries in 2011, an annual report in 2011 was given (in writing), as well as annual reports detailing all expenditures, costs, licenses and status of the Trust in 2012, 2013, and 2014.  Dille (directly or through Thompson) and Williams had many hundreds of communications with the Trustee and never objected to any final decisions. (An annual meeting was held on December 19, 2015 in New Castle, Pennsylvania to discuss all matters pertaining to the Trust, the beneficiaries were asked to sign non-disclosure agreements, Lorraine Williams did and attended the meeting.  Flint Dille, who was working with Don Murphy and giving out information about Buck Rogers and the Trust, as already described, refused and wanted to attend remotely and not in person.  He was advised he was welcome to attend but had to come in person and sign the non-disclosure agreement, he declined.)

In 2015 as the Trust neared an agreement to license Buck Rogers for a television show, things with Flint Dille began to change.  Flint Dille was advised of negotiations with all the parties being solicited. Dille's attorney, Richard Thompson was retained by Geer to work with McGregor to finalize a deal and draft an agreement.  Dille and Williams were completely informed of all these happenings.  THEN Don Murphy attempted to scuttle the deal with Alcon, the company who was being negotiated with for a television license.  Murphy and his company Team Angry had been a suitor but were not amongst the finalists.  Murphy contacted Alcon and tried to interfere with negotiations, to no avail.  He then announced on July 11, 2015 that his company would produce a film based on Armageddon 2419 with Anthony Rogers — Buck Rogers.  The article was titled **Original Buck Rogers Novel "Armageddon 2419 A.D." to Blow up Big Screen, Courtesy of Angryfilms**. Dille would co-script the film.  Other compensation was suggested outside the Trust to get Flint Dille's support.  Jane McGregor informed the Trust that this was a ploy by Murphy to get a license and Williams agreed with the characterization in her deposition already referenced and discussed hereinafter.  McGregor informed the Trustee that this was a common tactic used by Murphy.

Cease and desist letters were sent to Murphy about the use of **Buck Rogers**. (Buck Rogers does not appear in the novella, Anthony Rogers does.)   In the Trust's answer to Team Angry's Second Amended Complaint, the Trust averred it did not own Armageddon 2419, A.D. In the Nowlan Family Trust's Opposition to the current Trustee's 9019 Motion they averred that Armageddon 2419 was in the public domain (not Buck Rogers). (See ECF 358-365.)

Team Angry filed suit against the Trust; Flint Dille, in partnership with Murphy cooperated with Team Angry and Murphy.  Dille's attorney, Richard Thompson when confronted with Dille's behavior, working against the Trust to destroy its primary asset, Buck Rogers, indicated, in an e-mail dated August 5, 2015, "…When Don Murphy announced his plans for a movie based on Armageddon 2419 at Comic-Con, I had hoped that it would be a flash in the pan that would be quickly resolved, but it looks now like that may not be the case and that there is now a direct conflict of interest between Flint and the trust. Under these circumstances, I believe that I need to resign from further representation of any of the parties in connection with Buck Rogers or Armageddon 2419.  Accordingly please accept this e-mail as my notice of resignation." This email was sent to amongst others, Flint Dille and Jane McGregor, See Exhibit "H" attached hereto and incorporated by reference herein.

In 2011 the Nowlan Family Trust (NFT) which had filed an intent to use trademark application for Buck Rogers (after DFT's which had been voluntarily surrendered due to Flint Dille's gross negligence) began to litigate.  The litigation was handled initially by the law firm of Kloss, Stenger and LoTempio.  With the litigation to collect legal fees by Fross Zelnick (created by Flint Dille), loss of DFT's trademark and the TeamAgry Filmworks litigation and the litigation opposing NFT's application, licensors became hesitant to invest in the Buck Rogers registered trademark, and revenues were not adequate to support litigation. Lorraine Williams stepped in and financed the litigation and consulted on it generally.   With the commencement of the Team Angry Films litigation she also supported that litigation financially and consulted on it generally.  She completely supported Geer's decision in all litigation.  Williams was

not only in constant communication with the Trustee regarding this litigation she also had complete interaction with legal counsel in that matter, David Aronoff.  Despite Movants' assertions Geer did not initiate these matters but had to defend the Trust's interests with the support of Williams. With a mailing date of September 25, 2015, the United States Patent and Trademark Office Trademark Trials and Appeals Board entered an opinion at Opposition No. 91200643 denying the DFT opposition of the NFT application for a United States registered trademark for Buck Rogers.  This decision was appealed, a de novo appeal, which vacated the decision and the matter proceeded to protracted litigation with NFT and monumental discovery, complete with numerous depositions all around the United States.  Lorraine Williams was informed of every aspect of this litigation and supported it tactically and financially.  Motions for Summary Judgment were filed by both sides and the court issued an order and opinion on August 25, 2017, permitting the matter to go to a jury trial on the primary issue of the trademark.  It was at that time that Williams withdrew her financial support from the Trust regarding all the pending litigation for personal reasons leaving Geer with no monies to support the litigations.

Before and after the team of Murphy/Dille commenced the Team Angry lawsuit, they worked assiduously in the public media to undermine the Buck Rogers property which along with the TTAB decision impacted on licensing, bringing it to a virtual standstill.

It was under these circumstances that the Trust filed for bankruptcy.  Both beneficiaries were given written notice (Dille through Thompson) of a "substantive business decision" but before the matter could be discussed they would have to sign a non-disclosure agreement.  Dille, obviously, was actively working against the interests of

the Trust with Murphy, did not sign (through counsel Richard Thompson).    Both

beneficiaries did not sign the NDA (See Exhibits "I" and "J" attached hereto and

incorporated by reference herein) and cut themselves off from communication with Geer.

Subsequently the bankruptcy was filed.

<u>Fraudulent Assertions by Don Murphy, Team Angry Filmworks, Inc., Flint Dille
and Lorraine Williams</u>

Don Murphy, Team Angry, Flint Dille, and Lorraine Williams have blatantly and

obviously engaged in false, scandalous, impertinent, and vituperative allegations without

any factual basis in their "Memorandum."    The court should seriously consider this

extreme misbehavior in its consideration of the Movant's entire position.    On November

27, 2018, in open court counsel for Don Murphy and Team Angry accused Geer of

violating the court's order and selling two George Barr sketches at a Heritage Auction.

The movant concluded that this had happened, and then went on to allege other items

may have been sold and postulates "past misdeeds" without any evidence.    This approach

of alleging criminal conduct, misdeeds, conspiracies, and misbehavior without a scintilla

of evidence is indicative of the Movant's approach: <u>Make unfounded scandalous</u>

<u>accusations without any proof</u>.

It should be noted that the current Trustee, Robert Bernstein investigated the

allegation of this "sale" and confirmed that it had NOTHING TO DO WITH THE

TRUST or Louise Geer or Daniel Herman.    Indeed the positions of the Movants when

viewed through the lens of this unethical, unsubstantiated allegation should inform the

court of the Movants' ill motives and proclivity to allege anything negative without ANY

factual basis.    This conduct is clearly a violation of the Pennsylvania Disciplinary Rules

of Conduct, 3.1 (meritorious claims), 3.3 (candor toward the tribunal), and it is also clear

that making such unfounded unsupported accusations in open court and in a
Memorandum violate Fed. R. Civ. Proc. 11(b)(1), (2), and (3).

<u>The Bad Faith of Lorraine Williams in her Declaration Compared to Her
Deposition of January 11, 2017, which is Completely Contradictory</u>

If the Court reviews the Declaration of Lorraine Williams it must, of
course, draw serious conclusions with regards to the Trust and Geer, however this
Affidavit is completely contradicted by the deposition, testimony sworn under oath, taken
by the Defendant Nowlan Family Trust in the Dille Family Trust v. Nowlan Family Trust
matter in Chicago, IL, on January 10, 2017, portions of which are attached hereto as
Exhibit "K" and incorporated by reference herein, and the Declaration of Geer (Exhibit
"L") and incorporated by reference herein.  It should also be noted that Don Murphy, in
Flint Dille's behalf threatened Lorraine Williams with litigation over her conduct towards
her brother Flint on numerous occasions.  Lorraine Williams made it clear to Louise Geer
on numerous occasions after the Team Angry litigation had started that she knew Mr.
Murphy and that he used litigation as a tool to punish people he didn't agree with and to
exhaust their financial resources.  She expressed extreme concern about him on a regular
basis (see the Declaration of Louise Geer, Exhibit "L").   In the deposition of Ms.
Williams she testifies that her involvement with regards to Trust matters ended
contemporaneously with her mother's death in February of 2009, Tr. at 20.  At the time
of her father's death, prior to her mother's passing away, her mother had been the Joint
Trustee in the Dille Family Trust and that Arthur Martin was also a Trustee but was
"totally passive" until the time of her death at which point he could oversee the transition,
Tr. at 24.  That Flint Dille, one of the Beneficiaries to the Dille Family Trust, her brother,
took a more active role starting in 2007.  She indicated "But I mean this was, mom's

feeling was, it was how families take care of, you know, sort of take care of the next

generation.  They give them a chance to spread their wings and this was mom's feeling.

It was time for Flint to have his chance.  You know, I'm not - - I've been out there, I'm

mean, I'm tough.  I know my weaknesses and strengths and it is hard to be a little brother

to a big sister like me.  So this was a great opportunity for mom to give my brother, who

is equally strong and impressive as a person, his reigns." Tr. at 29.  Ms. Williams also

indicated that he had authority to act in behalf of the Trust to the point of signing a

contract, Id.  She further commented that until the death of her mother, Mr. Dille acted in

that capacity.  Ms. Williams further explained that Flint Dille continued to play an active

role in the Trust which changed after their mother died and that the co-Trustee Arthur

Martin, made it clear that he really wanted to retire, Tr. at 31.  Ms. Williams also

explained that "so basically it is not a Trust that had a ton of assets that would interest a

bank or a traditional national management company so we looked around to find

somebody who could manage this kind of Trust, which is you know, a different animal.

And my brother identified Louise Geer as a person who could do it, understand the

property, understand the kinds of activities of the Trust, and who we thought was a great

person." Tr. at 32.  She also explained that after Louise Geer became the Trustee Flint

Dille's level of involvement in the Trust changed, she testified "absolutely, I mean he's

got a career, he's got to run, he's got a family, two kids that neither one of us are really

interested in running the Trust, Tr. at 36-37.  She also explained that licensing agents

were hired to handle licensing which was "and one of those was Licensing Works."  And

the question was asked:  Question: "Was one of those Licensing Works?  Answer:  Yes."

Ms. Williams was also quite clear that she was involved in the litigation in the Eastern

District and when asked "Did you review the Complaint before it was filed?  Answer: "I

believe we talked through it.   Question:   Okay, how about any of the Amended

Complaints that were filed in this action?  Answer:  I have seen them. Question:  Okay.

Answer:  Again, I'm not reading them as an attorney who is vetting them for, I trust Dan

and his people to do their job.  And so you know the specifics of it, if I had any questions

if I thought there was anything that, I would say something but that's not my call."  Tr. at

41-42.  She was further asked with regards to the letter of resignation of Arthur Martin

and the appointment of Louise Geer as Trustee, "and just for the record the documents

included are a declaration to service Successor Trustee of the Dille Family Trust by RBC

Co., dated March 19, 2011.  And then a letter of resignation from Arthur Martin dated

March 8, 2011.  And an appointment of Successor Trustee signed by Robert Nichols Flint

Dille June 6, 2011, appointing Louise A. Geer as a Successor Trustee.   And then an

appointment of Successor Trustee dated June 6, 2011, signed by Lorraine Dille Williams

appointing Louise Geer as Trustee and then a Pennsylvania Department of State

document dated December 20, 2011.  I guess it's changing the location of the Trust.  Mr.

Herman:  Correct.  Mr. O'Malley:  And then another Pennsylvania Department of State

document undated, I'm sorry, dated December 20, 2011, again appears to change the

situs of the Trust to Pennsylvania and then there is a formal document, there is a formal

document following that which is the instrument transferring the situs of the Trust dated

February 1, 1989, creating the California Trust, and then there is a document dated, the

last document is dated March 4, 2011, the resignation of Dennis Fox …," Tr. at 45-46.

Ms. Williams also explained "I mean Louise did a lot of just clean up stuff."  Tr. at 47.

Ms. Williams was asked whether or not she reviewed the documents prepared by Louise

Geer with regards to the Trust and she answered "I took a cursory look at them, yes."

And indicated that she consulted with her attorney Susan Carlton, Tr. at 48.  Ms. Dille

further testified with regards to the issue of whether or not the Dille Family Trust

Copyrights were in the public domain, Ms. Dille specifically testified "I do not believe

so." Tr. at 60.  She testified with regards to the first license with Herman and Geer

Communications, Inc. that she was familiar with the document, Tr. at 63, but she did not

participate in it.  She understood that it was a license to reproduce Buck Rogers materials.

She noted that the signature on the contract was that of Flint Dille, Tr. at 63.  With

regards to the second agreement between Herman and Geer Communications, Inc., and

the Dille Family Trust, she was asked:   Question:   Handing you Exhibit 5 which is

document number 015609 through 0115612.  Answer: Yes.  Okay.  Question:  Are you

familiar with this document?  Answer:  I am.  Question:  Have you seen this document

before?  Answer:  Yes.  Question:  And were you involved in negotiations regarding this

document?  Answer:  I was made aware of everything.  Ms. Dille further testified to the

question:  With respect to the reprints of the Buck Rogers comic strips that Hermes Press

publishes, do they pay any kind of royalties to the Dille Family Trust?  Answer:  Yes they

do.  Question:  Do they generate royalty reports?  Answer:  Yes they do.  Question:  And

do you as a Beneficiary get copies of the royalty reports?  Answer:  If I want them.

Question:   Typically what type of reports do you receive from the current Trustee?

Answer:  Anything I ask for.  Question:  Let me rephrase, is there or does she provide any

kind of regular type of reports?  Answer:  No.  Question:  Does the Trustee provide,

Louise Geer, does she provide annual reports?  Answer:  She has not in the last couple of

years, Tr. at 74.  (Subsequent to the filing of the lawsuit by Team Angry Filmworks,

which included Flint Dille as a participant).   Mrs. Williams further explained with
regards to royalties, Question:  And you don't ask for financial reports?  Answer:  We
were brought up to be self sufficient.  Question:  Do you receive any royalty payments
from the Trust?  Answer:  No.  Question:  Do you know why that is?  Answer:  I think
that for the last number of years we have not been able to generate royalties of any
substance at all because of this lawsuit.  Question:  Okay.  And that the expenses of
maintaining the property have far exceeded the revenues.  Question:  And then do you
receive any expense reports from Louise Geer?  Answer:  No.  Question:  So you
basically delegate all, everything to Louise Geer, is that correct?  Answer:  I trust her.
Question:  Okay, Answer:  I do trust her and I think she is an honorable person.
Question:  Okay.  Tr. at 76.  Ms. Williams further explained "I'm smart.  I've been in
licensing and all this long enough to know that, basically, revenue streams have been shut
down.  Question:  Okay.  And do you, does the, is there any times when the beneficiaries
meet with the Trustee?  Answer:  Yes.  I meet with Louise when I want to.  Question:
Okay.  Is there an annual meeting?  Answer:  There can be.  Question:  What do you
mean, there can be?  Answer:  If we see it necessary.  We tend to, we tend to work it
when I'm going to be going through the area.  So, you know, when we're going to be
there naturally.  We tend not to put any extra burdens on any of, ourselves.  Question:
And would your, would Flint Dille attend?  Answer:  He would certainly be included if
he wants to, yeah.  Question:  Are notices sent out for that?  Answer:  Yes. Yeah.  I mean,
we will communicate.  Hey, I'm driving through on whatever, you know, two weeks
from now.  Does everyone want to get together?  Or we're all going to be on the West
Coast.  Whatever.  Very informal.  Very informal.  Tr. at 77-78.  Ms. Williams was also

asked regarding the Fross Zelnick litigation, Question:  Do you know the nature of that dispute was?  Answer:  Yes.  They overbilled and underperformed.  Question:  Why did you say that?  Answer:  They did not, they did not do the job for which they were hired to do, Tr. at 78.  Question:  And what job were they hired to do?  Answer:  They were hired to review and make sure that all the trademarks were in good shape.  Question:  And can you explain that?  Answer:  I mean, we had, we were not, dealing with Jenner, I mean, that was a decision that was everyone's decision.  And Flint found Fross Zelnick was a good firm and hired them.  And we said we needed someone who's going to maintain these trademarks, tell us where we stand and what we have to do.  Question:  And why was there a need to have somebody maintain - - Answer:  We've always done that.  It's just - - - this was a transition time.  I mean, it was a very difficult transition time.  Question:  And was that after your mother passed away?  Answer:  Yes.  Yes.  Immediately following.  I mean, within weeks.  Question:  Are you aware that there was a cancellation action filed against two of the registrations owned by the Dille Family Trust by the Nowlan Family Trust?  Answer:  I'm not, I was not involved in that.  I was not involved in any of this at this point.  Tr. at 79.  Question:  Okay.  So you didn't have any involvement in the cancellation?  Answer:  No.  Question:  Who from the Trust had involvement?  Answer:  That would have been Flint.  Question:  Do you know if the Dille Family Trust has any active U.S. Trademark registrations?  Answer:  I know we have active registrations in Canada.  I don't know if in the U.S.  I'm not sure.  Question: Would it surprise you if the Dille Family Trust didn't have any -- … The Witness:  in light of what has been going on, it would, I think there would be some difficulties.  I think that we've had some bad representation and I think some unfair things have

happened. … I just, I, I'm, I find this entire action by the Nowlans to be outrageous and, and I think immoral.  Question:  So you said you weren't involved in the cancellation action at the time it was going on?  Answer:  Tr. at 80.  Ms. Williams again commented on the fee dispute with the law firm Fross Zelnick.  Question:  I mean, what was your activity with respect to the fee dispute with Fross Zelnick … Answer:  Yeah.  I can't even figure out what you're trying to ask.  I'm sorry … I didn't see I had much of a role to play.  I believe that ended up going into Louise's lap.

Most importantly, Ms. Williams characterized her brother's manner of handling, or as the case was, mishandling the affairs of the Trust prior to Louise Geer taking the position as the Trustee.  At page 88 of the transcript the question is asked:  Did you and Flint Dille have any disagreements regarding how the intellectual property of the Dille Family Trust should be maintained after your mother passed away?  Answer:  Yeah.  Question:  And what was the nature of those disagreements?  Answer:  I'm a business person.  I'm very methodical.  I, you know, I see a process for doing stuff.  Flint is a creative person.  He has absolutely no sense of business.  He doesn't understand, you know, how things are done, and we locked horns over it periodically.  Didn't want to spend the money for the attorney to do the maintenance and all that.  That's money you have to spend.  And you know, I mean, it's a business versus a creative person.  Question:  So to be clear, so you're saying Flint didn't want to spend the money to maintain the trademarks?  Answer:  He didn't think it was, it always, his whole life had been maintained by someone else.  It's not that - - he didn't know.  He didn't know about it and, you know, it was my job to educate him.  Question:  But as being the business

person, you didn't take an interest in the legal status of the trademark registrations?
Answer:  I, there was a point at which I just said, you take care of it., Tr. at 88-90.

This completely supports the contention that the loss of the registered trademark of Buck Rogers by the Dille Family Trust was as the sole result of the negligence actions of Flint Dille, not Louise Geer or anyone else.  The cascade of events which resulted in the instant Bankruptcy are as the sole, direct, and proximate result of the gross negligence and mismanagement of Flint Dille when he was controlling the Dille Family Trust based on the testimony of his sister as well as the record previously discussed in the renewal application before the Trademark Trial and Appeals Board.

Ms. Williams also candidly deals with the issue of Team Angry Films and Don Murphy, a matter on which she seems to have made a 180 degree turn in on her Affidavit.  Her sworn testimony, however, speaks volumes and contradicts the Affidavit which was apparently drafted on the same word processor as that of Flint Dille's apparently by the same attorney who filed the Motion to Dismiss.  The Court should carefully review pages 166 through 167 of the transcript of testimony of Lorraine Williams taken during that deposition.  It indicates:  Answer:  My understanding of what the claims are is, they want, Don Murphy, as par usual, wants to do something for free.  Question:  Okay.  And what he wants to do is with respect to Armageddon 2419?  Answer:  I think that that is a subterfuge.  Question:  And what do you think he's really trying to do?  Answer:  Buck Rogers.  Question:  And in what way?  He's trying to produce a Buck Rogers series - - Answer:  Yes.  Question:  - - is that your understanding?  Answer:  I think probably more likely a feature film.  Question:  And is it correct that your brother Flint Dille is involved with Angry Films?  Answer:  That is correct.  I'm not - - wait.  I'm not sure he's involved

with Angry Films, but I know that he and Don Murphy have been involved on the production of a Buck Rogers film.  Question:  Okay.  And have you discussed Angry Films with your brother?  Answer:  No, because I want to keep things civil.  There's best things that are - - what constructive, what constructive conversation could be had?  Question:  Is your brother, Flint Dille, still a beneficiary of the - -  Answer:  Absolutely.  Question:  - - Nowlan Family Trust?  I'm sorry.  I keep saying that.  Dille Family Trust.  I'm sorry.  Answer:  Yes, he is.  Question:  And what's your understanding of the current status of the litigation with Angry Films and Don Murphy?  Answer:  I believe we're in about Phase 3, and I think we have been successful in all the other phases.  Don Murphy has a reputation of just keeping at it and keeping at it.   And his modus operandi, somewhat like the Nowlans, to my perception, is to just try to outspend us, outspend our capacities.   Question:   I believe you testified earlier that you don't know whether Armageddon 2419 is in the public domain or not?  Answer:  I did testify to that.  I don't know.  This telling colloquy completely contradicts the statements of Lorraine Williams at the hearing on November 27, 2018, and her Declaration.  It is clear from the "term" sheets and from other information which will be referred to later that Ms. Williams has been frequently threatened by Mr. Murphy in various ways and that ultimately she gave into these threats despite her grave reservations regarding Mr. Murphy which she made clear during this deposition.  The Court should look very critically at her Declaration which is contradicted by her deposition testimony and actions.

Further, let us consider constant communications between Lorraine Williams and the Trustee together with the annual reports issued in 2011, 2012, 2013, and 2014.  An annual report was not issued in 2015 due to the fact that Flint Dille was actively

communicating with and supporting an action against the Trust in the Team Angry Filmworks matter.  A meeting was held in New Castle, Pennsylvania, and Mr. Dille was given an opportunity to attend but refused to do so unless he could record the proceedings, which obviously would be given to Mr. Murphy for review and potential use in his lawsuit as litigation strategies with regards to the Team Angry Filmworks lawsuit would have been a subject of the meeting.  It should also be noted that Williams regularly visited New Castle to discuss Trust matters and Geer traveled to Lorraine Williams homes in Chicago and in Florida to discuss the budget for litigation, review costs and expenditures and plan strategy.

DFT is a Business Trust

Note that the Summary of the DFT Report 5-21-14 stated: 'The DFT is on course to return as a viable business enterprise with a host of products which are marketed worldwide.

A review of the Pennsylvania statutory law regarding Business Trusts *see:* 15 Pa.C.S.A. Chapter 95 , Sections 9501-9507. clearly establishes that the Dille Family Trust is a business trust under Pennsylvania law.

Section (c) specifically states that "This chapter is enacted to codify and clarify certain common law principles applicable to business trusts"

§ 9501.  Application and effect of chapter.

(a)  General rule.--

(1)  Unless the context clearly indicates otherwise, this chapter shall apply to and the words "business trust" in this chapter shall mean an association organized as a trust:

(i)  Hereafter established under the laws of this Commonwealth.

(ii)  Whose deed of trust or other organic document states, by amendment or otherwise, that the trust exists subject to the provisions of this chapter, in the case of a business trust heretofore established under the laws of this Commonwealth or heretofore or hereafter established under the laws of any other jurisdiction.

27

(2) The words "business trust" in this chapter shall not include:

(i) A trust contemplated by section 1768 (relating to voting trusts and other agreements among shareholders) or any similar provision of law.

(ii) A trust for creditors.

(iii) A mortgage, deed of trust or other indenture or similar instrument or agreement under which debt securities are outstanding or to be issued.

(iv) A trust for the benefit of one or more investors with respect to a lease of real or personal property, unless the instrument creating the trust is filed under this chapter.

§9507.  Foreign business trusts.

(a)  General rule.--A business trust organized under any laws other than those of this Commonwealth shall be subject to Subchapters B (relating to qualification) and C (relating to powers, duties and liabilities) of Chapter 41, as if it were a foreign business corporation, except that a qualified foreign business trust shall enjoy the same rights and privileges as a domestic business trust, but no more, and, except as otherwise provided by law, shall be subject to the same liabilities, restrictions, duties and penalties now in force or hereafter imposed upon domestic business trusts, to the same extent as if it were a domestic business trust.

§9502(d)  Termination.--Except as otherwise provided in the instrument:

(1) The business trust may not be terminated, dissolved or revoked by a beneficial owner or other person.

(2) The death, incapacity, dissolution, termination or bankruptcy of a beneficial owner or a trustee shall not result in the termination, dissolution or revocation of the business trust.  In another part of the Code an Ordinary Trust is defined as **"Ordinary trust."**

Any trust, other than a business trust or a living trust, which takes effect during the lifetime of the settlor and for which the trustees of the trust take title to property primarily for the purpose of protecting, managing or conserving it until it makes distributions to the named Beneficiaries.   An ordinary trust does not usually include Beneficiaries of the trust.   A trust that has an objective to carry on business and divide gains, nor does it either expressly or impliedly have any of the following features:   the treatment of beneficiaries as associates, the treatment of the interests in the trust as personal property, the free transferability of beneficial interests in the trust, centralized management by the trustee or the beneficiaries, or continuity of life, 72 P.S. Taxation and Fiscal Affairs §8101-C Definitions.

The courts have discussed the difference between an "ordinary trust" and a 'business trust."   The test centers on the sufficiency of business characteristics to defeat a claim that it is an ordinary trust. <u>Kosco v Commonwealth,</u> 987 A.2d 181 (2009) The court specifically found that the business character of a trust controls over the settlor's purported intent to create an ordinary trust. The test has six business features and recites that if the trust has *any* of these business features, it does not qualify as an ordinary trust.

The DFT meets this test in more than one of the enumerated features. It contains numerous paragraphs authorizing the trustee to carry on business and earn income for the beneficiaries, See Trust ¶4. A-M (Article IV Trustee's Powers).   Basically the Beneficiaries are treated as business associates. The Trustee is authorized to carry on business including selling and disposing of the Trust property and earning investment income, See Trust ¶3.A -0 (Article III Trusteeship).  DFT entered into numerous business transactions which generated licenses and revenue.  The deposition of Lorraine Williams, previously referenced gives numerous examples of business activities of the DFT.  She testified that there were business licenses which she consulted on from 1997 to 2009, Tr. at 20 (see generally Tr. 20-22).  She testified that there had been a long term film license with Disney, Tr. at Id. She testified that there was an option/license with Millenium Films and the rights were transferred to Freedom Films, tr. at 53-57.  There was a license with Dynamic Forces, Tr. at 109, Hermes Press, Tr. 63, Go Hero, Tr. at 112, Nu Image in 2008, Tr. at 112.

DFT does have a Perpetuity Provision see. Section 2-H ending the trust 21years after the death of the settlors and the settlors' now living issue. Note that this applies

'unless sooner terminated in the manner herein provided'. Both children of settlors are living, as are grandchildren.

Section 6.L Distribution at Surviving Spouse's Death was administered under the Estate of Virginia N. Dille. DFT was left in place holding onto its rights to 'Buck Rogers' Arthur Martin served as trustee and then both beneficiaries (Lorraine Virginia Dille Williams and Robert Nichols Flint Dille) appointed Geer as Trustee, to continue the Trust. Rights of beneficiaries are determined by the trust instrument. Even approvals for a plan of merger do not require approval of the beneficiaries of the constituent trust. See.**15 PA Cons Stat Chapter Ch.3 Entity Transactions Section 327** Approval by business trust.   DFT has been registered as a business trust with Pa Department of State's Corporation Bureau.  See Exhibits "M" attached hereto and incorporated herein.

Registration of a Corporation, Limited Liability Company or **Business Trust** starts with the PA Department of State's Corporation Bureau.  Once the entity is registered, the Department of State informs the PA Department of Revenue that the corporation is doing **business** within the Commonwealth and a corporate account number, or box number, is assigned.

Note that there is a differing treatment regarding PA Inheritance Tax for the 'family-owned business' and this often leads family members to seek differing treatment for purposes of income and sales tax for a business trust.  Expenses, debts, obligations, and liabilities incurred in connection with a qualified family-owned **business** interest exempted from inheritance tax are not deductible for inheritance tax purposes.  DFT is presently governed by the terms of the residuary trust because of both settlors, Robert Crabtree Dille and Virginia Lorraine Dille, are deceased. The current beneficiaries are

their children, see the attached Trust and Amendment (the Amendment which was curiously not attached to the Movant's Memorandum), Exhibits "N" and "O" attached hereto and incorporated by reference herein.

<u>No Lack of Communication Between Geer and the Beneficiaries; The Trustee Scheduled to Discuss the Potential of a Bankruptcy Filing with the Beneficiaries (No Bad Faith on the Part of the Trustee; Breach of Fiduciary Duty on the Part of the Beneficiaries in Refusing to sign a Non Disclosure Agreement</u>

Woven through Movants memorandum are various assertions regarding communications with beneficiaries: see pages 1, 5-9, 12 and these are responded to as follows: Movant, Lorraine Williams, in her deposition testified at length about her many communications with Geer and this is articulated elsewhere in this memo. Geer began to have problems with Flint Dille almost from the beginning of her tenure and these were recited in the reports to beneficiaries. [These reports have been made Confidential in the Eastern District Litigation but have been provided to Bernstein and are available for the court to review.] For a while Richard Thompson, Esquire, served as one of the Trust's attorneys and as Flint Dille's personal representative for trust purposes and provided a conduit for communication between Geer and the unhappy and disgruntled Flint Dille, which worked well for a time. This bifurcated method of communication was necessary for the running of the trust's business and is also evidence of the severity of the long standing feud between the siblings.  Thompson also worked with Geer and the trust's licensing agents as the trust negotiated deals for television and/or movie deals in 2015. Problems with Flint Dille's actions vis-a-vis the trust worsened significantly after Flint Dille partnered with Don Murphy/Team Angry Films and announced their intent to do a movie, see Exhibit "P" attached hereto and incorporated by reference herein. Geer contacted Thompson as Flint Dille's representative, see Exhibit "Q" attached hereto and

incorporated by reference herein. Although Geer wanted to continue working with Thompson on the movie/television deals, Flint Dille refused to agree. Thompson then wrote to trustee that he had to step completely aside, see Exhibit "H". Geer responded and suggested a fee agreement with him that took into account his 5% general retainer for trust entertainment deals but which deducted the fee for replacement transactional counsel from that movie retainer and Thompson accepted that suggestion, see Exhibit "Q", attached hereto and incorporated by reference herein. These memos demonstrate that Geer worked with Thompson as Flint Dille's conduit, and that Geer was prepared to work via a 'chinese wall' that would continue Thompson's participation in the negotiation and drafting of transactional documents between the trust and various significant licenses for the trust. And Thompson was willing to do so. However, Flint Dille made that cooperation impossible and cut off the line of communication with Geer with no alternative suggested. Arguments made in (a)(1) of motion are denied and are completely inaccurate and irrelevant to this bankruptcy.

Movants also do not mention that Doc 453-5 Exhibit C General Ledger 6 of 12 at line 154 refers to a request to beneficiaries of the trust for $2500 each and at line 160 requesting loans from both beneficiaries. The ledger reflects substantial loans from Lorraine Williams to the trust and indicates that Flint Dille provided no financial support. That was the time for the beneficiaries to review the work of the trustee for changes, irregularities and alternative plans for the trust, which included the possibility of bankruptcy at that point, and after review and discussion, no such changes were implemented or requested by Lorraine Williams.

As discussed previously, Flint Dille continued to complain. Lorraine Williams also ratified the settlement made by trustee with FZLZ and provided all of the money to implement that agreement while Flint Dille, who created the FZLZ debt by his own actions provided no funds for the resolution. Lorraine Williams also participated directly in the payment of Fox Rothschild LLP for the litigation commenced by Team Angry Films against the trust. Lorraine Williams received reports of all disbursements and approved of them directly and ratified them by continuing to loan funds to the Trust. Discussions occurred regularly about the litigations and the priority for payment of costs, fees and the like but at no time did Lorraine Williams suggest any bad faith, self-dealing or fraud by Trustee. As recited previously she was very supportive and an active participant. Her cessation of financial support was described to trustee as 'cash flow' and personal issues. She was disappointed that Judge Beetlestone in her opinion of August 25, 2017, had not completely granted summary judgment against NFT and the prospect of continued costs. Her final loan for Fifteen Thousand Dollars ($15,000) was received on April 14, 2017. The Motion does not recite these facts. Nor do they explain Lorraine Williams' abrupt change of position. There had been no accusation of concealment or self-dealing by Geer, Herman or Geer & Herman P.C., or of any abuse of the bankruptcy process raised by Williams directly or by her personal counsel with whom she regularly consulted. Any such self dealing is specifically denied.

Williams and Dille assert that they were not informed of the plan to declare bankruptcy prior to its occurrence.  However, neither one would execute a non-disclosure agreement prior to a suggested meeting as requested by Geer.  They avoided any fiduciary duty to the trust of non-disclosure and at the same time refused to participate in

the decision-making process, which they now complain about. Not being informed prior to the filing is due to their own refusal to participate in a meeting with Geer.

Geer and Lorraine Williams communicated regularly about trust business. There were problems with communications with Flint Dille which were initially solved by use of counsel as a 'conduit'. This system broke down when the Flint Dille/Don Murphy partnership [discussed above more fully] developed.

The abrupt withdrawal of financial support by Lorraine Williams left Geer with few alternatives. A trust meeting was proffered by Geer but both beneficiaries declined to execute confidential and non-disclosure agreements thereby refusing to participate in the decision.

In reply to the assertion that the beneficiaries were not given notice of the bankruptcy, this averment is inconsistent with the facts as the beneficiaries were sent notice of a "substantive business decision" on or about September 26, 2017, See Exhibits "I" and "J"; in response to this notice the beneficiaries indicated that they would NOT abide by their fiduciary duties and execute any non disclosure agreements. The factual background for this decision has been previously discussed.

<u>The within Motion has been filed in bad faith by Movants</u>

Don Murphy and Team Angry Filmworks, Inc. previously filed a Motion to Dismiss or Convert [Doc 288] which was withdrawn [Doc 307] per stipulation [Doc 308]. So the first question which has to be posed is 'What has changed since then in the matters asserted in the current motion to dismiss or convert? [Doc 453]"

Movants are judicially estopped from doing what they are attempting to do in the within Motion after they entered into a settlement agreement as part of a proposed plan

which consented to, acknowledged and accepted the bankruptcy. They did not question

the matters complained of at that time and should not be permitted to complain now.  The

court can deny a motion to dismiss where it is filed in bad faith and is an abuse of

bankruptcy process, In re Caola 422 BR 13 [Bank DNJ 2010].  The facts  recited in this

memo clearly establish bad faith and probably fraud on the part of all or some of the

Movants.

That being said, Movants have asked for conversion or dismissal which is

governed principally by 11 U.S.Code §1112, and Section (3)(b)(1). This should be denied

when it deals with matters that this Court has already determined by the appointment

under Section 1104(a) of a trustee or an examiner is in the best interests of the creditors

and the estate, see. Memorandum Opinion of July 28, 2018. [Doc 239].  Although Geer

has asked for a hearing on that matter and has submitted the within Memorandum, the

question of the 'Expedited' need for relief is not properly raised at this time as to Geer,

who is no longer trustee, instead of the current trustee Bernstein who now has

responsibility for the trust.  The inclusion of Lorraine Dille Williams as a movant does

not change the precedence of the court's Memorandum Opinion as she was listed as a

creditor at that time. Furthermore, a plan proposed by Trustee [Doc 340 entered on

October 12, 2018] was filed prior to this 'expedited' motion.  This plan was duly filed

with this court and thus evidences and recognizes the legitimacy of the bankruptcy itself,

despite Movant's claims otherwise. The Rule 9019 Motion/plan proposed 'a new

company which is to be owned by TAF and the Estate' [Doc 340 page 3 of 37] and the

accompanying Disclosure Statement [Doc 341] which specifically referenced 'TAF,

through Don Murphy, as president of TAF [Doc 341 page 3 and many other places

throughout] and Plan Summary [Doc 342] references TAF. The Operating Agreement [Doc 329-1] in Article II Section 2.4 names Don Murphy as agent, in Section 2.9 with Team Angry Filmworks, Inc. as Manager of the Company and, in Section 8.12 recites the following:

> Notwithstanding the provisions of this Article, TAF is permitted to transfer part of its Membership Interests to the following specific group of persons or entities with particular interest or experience related to the history of Buck Rogers: Nowlan Family Trust, Robert Flint Dille, and/or Lorraine Dille Williams.

Demonstrating finally that all of the parties listed as 'Movants' were part and parcel of that Plan and none of the issues raised by Movants in the Expedited Motion were specifically raised therein. All of these matters belie the proposition that the Expedited Motion had any exigency or even relevance. The court has the authority to take any action that is necessary and appropriate to prevent an abuse of power. Morrana v. Ctizens Bank of Mass, 549 U.S. 365 (2007).  Judge Judith Fitzgerald has found that the right of a debtor to convert is absolute and unqualified except in the case of bad faith conduct by the debtor and that the court has inherent authority to take any action necessary to sanction abusive litigation practices. Taylor v. Winnecourn, 462 B.R. 527 (Bankr W.D. Pa Pa JKF).  In the within case it is the Movants who have acted in bad faith and with unclean hands in the within action and whose actions should be sanctioned. In fact, the only actually new matter presented in this Expedited Motion is the reference to the phrase 'to preserve their appellate rights.' [Doc 453-2 page 2]  One could reasonably infer that the only reason Movants filed the within motion is to reiterate points which have already been brought before this Honorable Court and to act to obstruct and delay the progress of this bankruptcy matter.

This Motion on its face is an obvious attempt by Movants to focus the case on matters previously dealt with and Movants come before this honorable court in bad faith and with unclean hands and engage in gross misrepresentations of fact, made up facts, and vicious speculation without any factual support for no legitimate reason.

For example, Movants in their Section III (pages 14 – 20) seek to establish, by reference to Exhibit "G" (Doc 239) a Memorandum Opinion issued by this court, that Geer has operated in bad faith, despite the fact that the phrase 'bad faith' is not found within the opinion. The court wrote that the case 'is not making any meaningful progress towards a successful reorganization' [Doc 239 page 1] as the primary issue of concern. Along with the 'acrimony and pervasive litigation that has consumed this case.' [Doc 239 page 4 of 5]. They do not point out that the record was 'undisputed' [Doc 239] at that time and that no testimony had been presented by Geer's counsel who that day took full responsibility for providing discovery (and who unfortunately passed away shortly thereafter). A hearing on that matter has been requested but not held. If the court finds that the issues raised in its opinion have not been dealt with by Bernstein, then this is a good time to dispute the findings in the Memorandum Opinion as well as review the present status of those and any other problems.

Woven through Movants memorandum are various assertions regarding banking see pages 2; 6-10; and 14-17 and these are responded to as follows: Movants, in the preface to their Memorandum have referenced Geer's use of a Business Checking Account for DFT, and claimed that they had 'only recently uncovered' [Page 2] this despite the fact that their Exhibit C - General Ledger as well as Exhibit D – Negative Account Balance page 2 show that multiple wire transfers were deposited into that

account by Lorraine Williams and personal checks of Lorraine Williams were deposited into the account.  Movants imply that Lorraine Williams lent the trust over Two Hundred Thousand Dollars and directly paid additional thousands of dollars to specific creditors when she had no knowledge of the disbursements of those monies; no accounting; and believed Geer was engaged in self-dealing, breaches of fiduciary duties and fraud all to the detriment of the trust and its beneficiaries. [Declaration of Lorraine Dille Williams Doc 453-3].  The likelihood of anyone delivering such large sums of money to someone who they believed to be committing fraud and taking monies due to themselves is very unlikely, to say the least.  Her Deposition testimony belies this, "I'm smart, I've been in licensing long enough," and so forth, Tr. at 77-78. In Footnote 3 [Page 6] Movants suggest that the Application for Certificate of Authority in Pennsylvania was done in furtherance of a plan to misuse the monies in an unrestricted account. These suggestions were couched in language of 'belief... and may have' thereby trying to avoid the requirements of 'proof' and evidence while at the same time providing a defense for themselves against charges violations of Rule 11 and the Pennsylvania Rules of Professional Conduct.  Movants also fail to inform this Court that DFT had been governed by Illinois law previously by Arthur Martin, Esquire, trust counsel and then Trustee, and Geer as Trustee, then followed suit with the history of the trust administration by registering in Pennsylvania, the situs of the Trustee.  This matter was also reviewed by Richard Thompson, Esquire, who served as counsel for the trust at various times and also represented Beneficiary, Flint Dille.

Movants insist that the monies should have been 'into a trust account' which they specifically describe as an IOLTA [Page 7] without regard for the requirements of the Pa.

R. Prof Conduct 1.15(b) and (h) which specifically direct that attorneys should not use trust accounts to conduct anyone's business matters and which are also referred to by Movants [Page 8]. Apparently Movants believe that Geer should have violated Pa. Rules of Professional Responsibility. They opine that setting up a discrete checking account for the trust was done to avoid 'the rigid strictures of trust accounting' and to 'pay substantial and unearned fees to herself and her spouse' which Movants describe as potentially avoidable transfers which they characterize as 'fraudulent, dishonest, incompetent and gross mismanagement' of DFT. There is no evidence provided to establish that any of the payments were made outside of the ordinary course of business of the trust.

However, Movants switch back and forth within their memo between Pennsylvania and California law as controlling and completely failed to note that the trust had been administered under Illinois law prior to Geer's tenure. Their assertion in Footnote 3 that Geer filed in Pennsylvania to avoid restrictions of California implies agreement that Pennsylvania applies is obviously at odds with their conclusions at other places in the memo. Movants refer to the Pennsylvania Rules of Professional Conduct Page 8 as authority. Movants then recite from the California Probate Code throughout their memo [eg Page 10].

They have no coherent position and do not explain the reasons for their conclusions which are at odds with other conclusions asserted.

Bernstein in a Plan of Reorganization [Doc 340] proposed in its Section 16.2 page 32-3 that 'Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the Commonwealth of Pennsylvania, without giving effect to any choice of law provisions that would require the application of the law of any other jurisdiction.'

Then Movants assert that Geer provided 'first page of any of its bank statements—whether for periods prior to or after the commencement of this case' [Page 7] as evidence of Geer's bad motives. Their own Exhibit D is an example of two pages of the FNB statements that were provided and which contain all of the financial information. Admittedly there were 'standardized' pages from the bank which were not retained; however, these do not have any additional information specific to the trust.  Initial counsel for debtor provided the initial bank statements; subsequently Trustee Bernstein was provided with copies of the actual checks.  Movants also complain about the Ledger, which they included as Exhibit C and from which they quoted as evidence many times. Geer has responded to all requests from Trustee Bernstein who has been provided with voluminous trust documents and cooperation from Geer.

Movants continue throughout the memo to insist that the monies for the trust should have been in a Pennsylvania IOLTA account from the beginning of Geer's tenure.

Movants assert that there were egregious examples of accounting irregularities which rose to the level of fraud and were in breach of fiduciary duties. Admittedly, Check #179 [October 16, 2013], attached hereto as Exhibit "R" and incorporated by reference herein, was listed in the column for 'Receipts' and should have been listed in the column for 'Payments' in the ledger as Movant's Doc 453-5 [Exhibit C General Ledger Page 5 of 12], a review of the relevant FNB statement as [Movant's Exhibit D] which was not included in the Motion, indicates that it was a Debit from DFT not a Deposit. There is no evidence to support the averment of a 'short-term loan' to Trustee. To the contrary the check Memo on #180, attached hereto as Exhibit "S" and incorporated by reference herein, indicates that it was a payment re Trustee for 2012.  DFT Beneficiary

Report of May 21, 2014 indicated 'Trustee has been paid for 2011 ($13,250 billed) and 2012 ($17,416.50 billed)' which is consistent with the check memo on [Movant's Exhibit C] for $7,416.50 as Trustee payment for 2012. In addition Movant's Exhibit D indicates that the minimum balance for October, 2013 was $9,990.57 NOT the $4,014.16 stated in the Motion.  However, the FNB statement for October, 2016, Movant's Exhibit D does indicate a minimum balance of $4,014.16. Movants have concocted a theory of evil-doing based on their own flawed review of the evidence.

There was an overdraft fee in January 2014 of $16.03 for January 3, which was cured on Jan 8, 2014, by Wire Transfer deposit of a royalty from Go Hero for $325. Movant's [Exhibit C Doc 453-5 General Ledger page 6] and further by FNB statement Movant's [Exhibit D Doc 453-6 Negative Balance Statements page 1].  This royalty had been scheduled for receipt in the prior week but was delayed, causing the deficit in the account. Immediately after notification by the bank of an overdraft, Trustee also deposited $500 from Geer and Herman PC to cure the overdraft, cover any expenses to the trust caused by it, and determine its cause.

Movants are incorrect in their assertions regarding the use of an IOLTA to transact the business of the trust; their accusations regarding accounting improprieties were firstly concocted to explain their own failure to read the documents and secondly the overdraft fee of $16.03, was cured as discussed above and is a minor sum when compared to the length of Geer's tenure.

Movants comments, see page 13, about the IMGlobal final payment is wholly made up and put forward without any proof.  Do  Movants, in good faith, really believe that one of their members, Lorraine Williams, delivered the large sums of money

indicated as her claim if she believed that Geer was acting fraudulently, engaged in self-dealing, was without any information as to where these sums were going?

AND none of those assertions include actions subsequent to Bernstein's appointment.

Parsing away the hyperbolic and emotional aspects of Movants arguments, there are very few items remaining that might qualify as factual, and there are no assertions regarding items occurring after Bernstein's appointment.

<u>Conflicts of Interests and Avoidable Transfers</u>

NO legitimate argument can be made there exists any conflict of interest between the Trustee and Geer and Herman, P.C. This issue was addressed at length in Document 430 which is incorporated by reference herein. Moreover, as this matter is currently proceeding under the guidance of Trustee Bernstein and using this as a rationale or facts for dismissal of the case is highly questionable as it does not have any case authority to support such a contention.

Woven through Movants memorandum are various assertions regarding Avoidable Transfers: see pages 2,15, 17 and these are responded to as follows:

All of the matters recited by Movants were dated before Bernstein became Trustee and are 'old news' to the Court and were previously dealt with in the Memorandum Opinion. That being said, some discussion is warranted.

Movants assert that Louise Geer, an adult individual, is an 'insider' of the debtor and as such received 'avoidable transfers' without producing evidence of any avoidable transfer for the two year period prior to the bankruptcy filing to 'Louise Geer'. They must be assuming that *any* transfer to any insider should automatically be avoided because any

transfer to an insider is somehow tainted. Movants assume that all of the entries cited by them were avoidable without any supporting evidence. [This is more fully discussed below regarding communications with beneficiaries.]

The Bankruptcy Code 11 USC §544 however grants to a trustee 'avoidable transfers' as a MAY undo the transfer of money or property within certain time periods. However, the transfer is 'subject to various defenses' and is based on the concept of 'fairness' to all of the creditors. It is not a *per se* rule, but rather is a rule that calls for some reasonable scrutiny. Merely being an insider is not evidence of unfair payment within the meaning of Sections 547(b) and 548(a) of the Bankruptcy Code or avoidable under Section 544. An insider is defined in the Bankruptcy Code:

In this case the debtor, Dille Family Trust, is a corporation/business trust. Geer was its trustee. However, 'Geer and Herman, P.C.' is a professional corporation and, as such, does not fall directly into any of the articulated 'insiders' set forth in the statute. The fact that Attorney Herman is the spouse of Trustee Geer makes him a (vi) relative of a person in control of the debtor.

However, this status does not make all transfers made to Geer and Herman P.C. automatically avoidable, as Movants imply. Movants, without evidence, accused Geer of false reporting regarding payments to insiders in the one-year period preceding the filing. Furthermore, Counsel at the time advised Geer regarding completion of Doc. No 17, p. 147 #4 and that the payments described were in the normal course of business for professionals, attorneys and the like and passed through and did not need to be recited at that point.

As seen on the General Ledger, Movants Exhibit "C", Doc 453-5 Exhibit C General Ledger Page 1-12] DFT used several lawyers. For example, Kloss, Stenger & LoTempio handled most of the FZLZ litigation for attorney fees unpaid by Beneficiaries prior to Trustee's appointment; Borden, Ladner Gervaias LLP handled the trademark renewals in Canada; Richard Thompson, Esquire, who was counsel for DFT and beneficiaries and received a 5% fee for his work in a movie deal; Bonnie Mohr, LLC regarding FZLZ filings; Kirk Passmonti, Esquire, who handled actual conferences in NYC and represented Flint Dille individually in the litigation; Matthew Fladell who handled legal matters in California including a discovery dispute from the Eastern District case; Fox Rothschild who handled Team Angry litigation. Geer and Herman P.C. became litigation counsel and was retained to provide legal services in additional litigation after Fox Rothschild ceased its representation due to unpaid legal fees. At various times prior to its retention as legal counsel and when retained as counsel Geer and Herman P.C. paid litigation costs for the benefit of DFT and these litigation costs were passed through to be reimbursed from time to time as cash flow permitted, by Trustee.

Movants do, however assert that 'Louise Geer' is 'without question an insider' and suggest avoidance of all transfers to Geer and Herman P.C., without producing any evidence of direct transfers that were beyond the normal course of business or not passed through for the debtor' benefit. What they offer, instead, is a conclusion that the employment of a law firm is 'an insider' matter where the trustee and her spouse are both employees of a professional corporation and work on different aspects of a client's case. [Geer as administrator/trustee; Herman as litigation counsel after November, 2015 with

44

his record of at least 60 jury trials to verdict] and in essence, Movants assert that all payments to Geer and Herman, P.C. were fraudulent and thus avoidable without any proof of any unfair prepetition payments to Geer and Herman, P.C. from July 2011 to October 2017.   Movants do not question payments made to other attorneys or professionals by the trust; nor have they objected to the Claims of the attorneys and professionals made within this bankruptcy. Movants do not comment that Bernstein, current trustee, has employed his law firm as counsel and the court has approved.

All of these complaints concern matters complained of prior to Bernstein's appointment as Trustee and continue the movant's practice of diversion, false descriptions and attempts to delay and to derail this Bankruptcy.   Apparently the only professionals who should not be compensated and reimbursed for costs paid for the benefit of the trust are Geer as trustee and Geer and Herman, P.C. as counsel.

<u>Lack of Continuing Discovery by the Debtor Out of Possession</u>

The Movants Team Angry and Murphy withdrew their motions to convert and dismiss based on an agreement with Trustee Bernstein.   They admit this in their Memorandum. Geer has no knowledge of any continuing discovery regarding the prior discovery as the matters were withdrawn.   Additionally, Geer was no longer the Trustee, Trustee Bernstein was.   It is curious then how this argument can be made.   It should be noted, no Motions to Compel Discovery were filed by Team Angry/Movants after they entered into their agreement to settle with Trustee Bernstein relative to Rule 9019, nor was any communication received by Geer or her counsel regarding this issue.   Clearly this argument is made in bad faith.   The issues of prior discovery have already been discussed in this Memorandum and are incorporated herein.

## No Misleading Statements to Third Parties

Firstly, in responding to these assertions, the letters speak for themselves.  The correspondence referred to was all vetted and cc'd to Bankruptcy Counsel and approved by counsel.  It should be noted that the court appointed Heritage as the auctioneer.  This is a factual statement.  No objections were sustained and they were appointed. With regard to an auction, Herman was advised by Bankruptcy counsel that as a practical matter if the sale occurred within a ninety day window, the next scheduled group of hearings would occur after the auction.  Bankruptcy counsel however never filed for the auction within that time frame.    With regard to the assertions that the letter is a misrepresentation, the Trust was seeking to sell the assets of DFT and there was no legal action pending regarding all legally owned copyrights [pursuant to the Copyright Term Extension Act, CTEA 17 USC Sec 108, 203(a)(2), 301(c), 302, 303, 304(c)(2) Copyright 1998] subsequent to 1978 and miscellaneous personalty and the registered trademarks in Canada, Japan, Germany and France, as was set forward in Geer's opposition to the Motion for Approval of the Rule 9019 settlement.  It cannot be legally disputed that the Trust owns these rights.  Moreover, Murphy did not have pending litigation in the Western District: it was administratively closed.  Murphy represented he had ongoing litigation which is incorrect.  It is not a misleading statement to take a position that another party is legally wrong with regard to an issue.  With regard to Buck Rogers being in the public domain, as has already been discussed, Buck Rogers does not appear in Armageddon, 2419, A.D., which is what Murphy/Dille were arguing should be in the public domain.  Murphy and Dille are just plain legally wrong about this proposition.  Additionally, this is old news to the Court and no auction occurred.  The facts asserted by

the Movant have already been before the Court.  It is clear that Murphy/Dille want Buck

Rogers in the public domain to the detriment of the Trust and the creditors.

Other Baseless Accusations

Woven through Movants memorandum are various other assertions regarding

Geer: see pages 1, 5-9, 12 and these are responded to as follows:

Monthly Operating Reports [page 16] Movants assert that certain MOR's were not

filed. The Docket reveals filing #62, #97, #119, #149, and #180 by Geer for Jan – June

2018. The MORs for July and subsequent months were the responsibility of Bernstein.

MOR's were sent monthly by Geer to counsel for filing and the last report by Geer

was sent to Bernstein for review and filing. These MORs included copy of debtor's bank

statements and recited that Debtor made payments to the US Trustee's Office and to

Judge Judith Fitzgerald, Mediator.  The report for January, 2018, disclosed receipt of a

licensing fee of $100.00.

Once again, Movants have failed to read the record and made conclusions based

upon their failure to properly investigate.

Motion to Obtain Credit [page 16] was characterized as part of abuse by Geer.

The motion was proffered as a way to pay the Mediator. It was denied and eventually

withdrawn [Docs 186, 190, 204, 205, and 364] However, Movants characterize it as part

of an evil scheme –a scheme to have Geer obtain priority for re-payment to Geer of a

trust post-petition claim payment. The court can decide if this motion, which has been

denied and withdrawn, is relevant to the business of the trust at this time.

IMGlobal Agreement [page13, 17, Proof of Claim] Once again Movants' assertions of self-dealing are based on their incorrect and biased interpretation of the items which they themselves cite. There was nothing 'surreptitious' about the negotiation with any of the companies [eg. IMGlobal, Alson, Sony, Dreamworks, and many others] although all parties insisted on 'confidentiality agreements' prior to be start of serious negotiations.  Lorraine Williams and Richard Thompson as conduit for Flint Dille were regularly contacted for comments and input. In fact, Thompson served as transactional counsel for reviewing proposals and drafting the IMGlobal agreement [until Flint Dille demanded that he no longer do so –see above discussion].

Nowhere does the Agreement mention Geer, personally, and Herman as recipients of any monies. There are payments included in it for the Trustee of DFT, which are in fact, payments to the trust as royalty or payment for Executive Producer Services. Movants leap from 'receipt by trustee' to 'personal benefit' is the basis of their accusation, which they characterize as part of a pattern of self-dealing with no evidence. Movants also on page 13 characterize a receipt of monies from IMGlobal as a part of the nefarious plan of self-dealing despite the evidence of the deposit into the trust's banking account. They also do not consider the payment to Geer and Herman, P.C., for appropriate charges appropriate under the Bankruptcy Code as legitimate but as part and parcel of self-dealing because the assets would be sold, page 13. The criticisms of the handling of receipts by Geer has been discussed in more detail above and dispelled.

Note that Flint Dille, in his Proof of Claim, attached hereto as Exhibit "T" and incorporated by reference herein, [Claim 7-1 Part 2] Documentation complained in paragraph 12-c that he did not receive 'any payout' from a license; asserted paragraph 14

a conspiracy between Geer and Williams to buy the property in an auction without being subject to higher and better bidders; asserted paragraph 16 and 19 that Geer was selling personal property and collectibles which he inherited from this mother and in paragraph 25 asserted that he was owed 50% of all trust licensing contracts and in paragraph 25 that he was owed 50% of proceeds for any and all Buck Rogers property sold by Williams or the trust.; asserted paragraph 17 that 'someone' had submitted an incorrect will to probate; asserted paragraph 18 a 'bitter dispute' with Williams over her sale of assets and her failure to send him half of the proceeds; asserted paragraph 20 that he personally funded litigation expenses for $25,000; asserted paragraph 21 that he facilitated deals from 2003 to 2015 and was not compensated for $550,000; asserted paragraph 22 that he was due $50,000 for presentations and attending meetings; and finally asserted paragraph 23 that he lost profits because certain deals were not made.

It is obvious on its face, that most of Dille's complaints in the Proof of Claim and elsewhere about IMGlobal deal and Geer are part of a bitter and long-standing feud with his sister and that he has included Geer as part of that feud. It is also clear that Dille gives no thought to the costs of running a business trust which, as recited above, he put in jeopardy and into various litigations because of the way he handled the business of the trust when he was its manager, and for which he takes no responsibility.

Dille's Proof of Claim provides an insight into some of Dille's motivations: sibling rivalry, conspiracy theories and greed, none of which are relevant in a bankruptcy by beneficiary especially when proffered by the beneficiary who single-handedly changed a family business from one of stability and relative prosperity into one in chaos and serious debt.

Geer Plan The higher and better offer in Geer's Plan [Doc 381] put forward on November 1, 2018.  This plan, hereinafter referred to as 'Geer Plan' on its face provides a much better outcome for the creditors and for the administration of the Trust which is one of the primary tenets of Bankruptcy.

Movant's conflate the initial plan put forward by Geer when she acted as Trustee with another plan. The Geer Plan was filed 4 months after Bernstein became Trustee and 2 weeks after Bernstein filed a plan [Doc 342] in cooperation with Murphy, TeamAngry Filmworks, and Flint Dille. The most curious part of Movant's criticism of the Geer Plan is that the offer recited 'less than half' of an estimated value when their plan recited $15,000 start and the rest to be paid at an illusory time in the future when a 'profit' was made without any guarantee of payment ever.  On its face, Geer Plan is the better plan for Debtor.  It should be noted that a consultant was used in creating the plan bringing new information into the mix, this clearly is indicated on the Geer Plan and the document speaks for itself as opposed to an interpretation which ignores the actual document and takes liberties in interpreting it, which is bad faith, yet again on the part of the Movants.

<u>Conclusion</u>

In conclusion we suggest that the Motion to Dismiss be itself dismissed as it concerns matters already reviewed by this Court, by the Doctrine of Laches and because it is full of misstatements, mischaracterizations, propounded to divert the court from the true questions of bankruptcy down the path of the long standing and bitter family feud. Furthermore bad faith is not the grounds to dismiss a case that is already in bankruptcy (even though there was no bad faith during the case) and any remedy would be disgorgement not dismissal (which is not appropriate in this case). The current plan is designed to benefit the creditors and will give the best result as available in bankruptcy. Accordingly the Motion should be dismissed.

Respectfully Submitted

GEER and HERMAN, P.C.

By: /s/ Daniel I. Herman, Esquire
2100 Wilmington Road
New Castle, PA  16105
(724) 652-0511
Supreme Court No.:  38960